OTTERBOURG P.C.
Adam C. Silverstein
230 Park Avenue
New York, NY 10169
Tel:  (212) 661-9100
*Attorneys for Plaintiff*
 *Wendy Norris Grant*

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------- X

WENDY NORRIS GRANT,             :

                      :

            Plaintiff,     :

                      :

    v.                    :

                      :

URSULA MANAGEMENT, LLC and   :       **COMPLAINT**
DANIEL JOHN ENGLANDER,       :

                      :

          Defendants.   :

-------------------------------------------------------- X

Plaintiff Wendy Norris Grant ("Grant" or "Plaintiff"), as and for her Complaint against defendants Ursula Management, LLC ("Ursula Management") and Daniel John Englander ("Englander," and, collectively with Ursula Management, "Defendants"), alleges, on knowledge as to her own status and actions and otherwise upon information and belief as described herein, as follows:

## NATURE OF THE ACTION

1.     This is an action for federal securities fraud in connection with purchases of $1.3 million in limited partnership interests in a hedge fund that was forced by margin calls to liquidate, essentially at a total loss, less than two years after the plaintiff invested.  In the final analysis of the fund's final newsletter, sent by the defendants (the fund's general partner and its managing member/fund chief everything):  "What appeared to be a safe level of leverage

ultimately proved to be unsafe."   Yet the private placement memorandum provided to plaintiff in connection with her investments in the fund stated in no uncertain terms:  "The Fund will have *no* leverage."   That false statement, along with other material misrepresentations and omissions, induced and doomed her investments.

2.     According to the defendants, the margin calls that abruptly liquidated the fund resulted from the fund's "main risk" coming to pass—namely, the energy industry's "weak demand that was clearly going to get worse, a global pandemic, massive additions to supply, and a global price war. All at the exact same time."   Yet that "main risk," along with the risk of margin calls, was never disclosed to the plaintiff.

3.     Just the opposite, the defendants stated in the private placement memorandum provided to plaintiff that their investment approach would be "safe[]" and "low risk" because "the current low interest rate environment will be short lived and has encouraged excess risk taking."   In fact, the private placement memorandum contained *no* risk factors based on commodity prices, or supply and demand, in the energy sector, and assured prospective investors, like plaintiff, that, consistent with the conservative investment approach that the defendants espoused, "[t]he Fund will have no leverage."

4.     Those material statements were intentionally or recklessly false when made.  At the time that the offering documents containing those representations were provided to the plaintiff, the fund's margin debt was already significant.  More, it was precisely because of the fund's substantial margin debt—which plaintiff was assured in the private placement memo did *not* exist—that the fund was unable to ride out the short-term collapse in energy prices and was forced to liquidate in the face of margin calls.

5.      Plaintiff seeks the rescission of her purchases that she made in connection with defendants' fraudulent statements and omissions.

## JURISDICTION AND VENUE

6.      Jurisdiction in this Court is proper pursuant to 28 U.S.C. §1331, in that this is a civil action arising under the laws of the United States, and 15 U.S.C. § 78aa(a), in that this is a "suit[] in equity and action[] at law brought to enforce any liability or duty created by [the Securities and Exchange Act of 1934 (the "'34 Act")] or the rules and regulations thereunder." Because the Court has original jurisdiction over this civil action, it has supplemental jurisdiction, pursuant to 28 U.S.C. §1367, over all claims asserted herein because they "are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."

7.      Venue is proper in this District pursuant to 28 U.S.C. §§1391(b), in that (a) both defendants are residents of this State and, at least, one of the defendants resides within this District, and (b) a substantial part of the events or omissions giving rise to the claims alleged herein occurred within this District.

## FACTUAL BACKGROUND

A.      **The Parties**

8.      Plaintiff Grant is an individual residing in the County of Nassau in the State of New York.   At all relevant times, she was an "accredited investor" within the meaning of Rule 501(a) of Securities and Exchange Commission Regulation D.   Although "accredited" (based on the total value of her assets at the time), Grant is neither a trained, educated nor particularly

sophisticated investor.  Prior to the events described below, she had never invested in a hedge fund or, to her knowledge, master limited partnership.

9.      Defendant Ursula Management is a limited liability company organized under the laws of the State of New York and having its principal place of business in the County of Nassau in the State of New York.  Ursula Management is an investment adviser registered with the Securities and Exchange Commission ("SEC") pursuant to the Investment Advisers Act of 1940 (the "'40 Act").  At all relevant times, it was the general partner of the now defunct hedge fund, Ursula Yield Fund, LP (the "Fund").  In addition to general partner, Ursula Management also served as the Fund's management company.  In those capacities, according to the Fund's private placement memorandum, Ursula Management "provide[d] administrative, management and investment advisory services to the Fund and supervis[d] all of the other service providers to the Fund."

10.      Defendant Englander is an individual residing in the County of Nassau in the State of New York.  At all relevant times, he was the managing member, and, according to its investment adviser registration form, at least 95% owner, of Ursula Management.  Put succinctly in Part 2 of the currently available Uniform Application for Investment Adviser Registration and Report, or Form ADV, filed by Ursula Management, "Daniel Englander owns and controls" Ursula Management.   He served, formally or informally, as the Founder, Chief Executive Officer, Chief Investment Officer, Chief Financial Officer, Chief Operating Officer and Chief Risk Officer, of the Fund.  Englander, who, with his family, owned approximately a quarter of the Fund according to Ursula Management's currently available Form ADV, made all management, financial, investment and any other significant decisions for the Fund.  Englander takes great pride in his business, financial and investment background and acumen, particularly

his 10-year tenure with Allen & Company, where he mastered, according to the Fund's private placement memorandum, the "[l]ong-term style of Allen & Company consistent with that of the Fund."

11.     At all relevant times, each of Ursula Management and Englander owed fiduciary duties to the Fund's limited partners, including Grant.

**B.      Background of Grant's Initial Investment in the Fund**

12.     On or about June 28, 2018, Grant texted Englander, whom she had known personally and had considered a close friend, about investing some money with him.

13.     Grant had been introduced to Englander several years earlier, through her husband, Rob Janecek, who had met Englander when Janecek was the head racquets pro at Cherry Valley Country Club in Garden City, where Englander was a member.  Janecek and Englander quickly became sports and leisure companions and close friends, and soon thereafter the kinship expanded to include Grant and Englander's wife, Julia.

14.     During this time, Englander was managing two hedge funds under the "Ursula" brand, the Fund and Ursula Capital Partners, LP ("Ursula Capital").  The Fund (described in more detail below) had a minimum investment requirement of $500,000, had raised approximately $20 million in investment capital from Englander's family and friends, and was invested in master limited partnerships or "MLPs" (also described in more detail below).  Ursula Capital was a larger fund, which had a minimum investment requirement of $1 million, had raised approximately $100 million in investment capital from a broader pool of investors, and was a long investor in United States publicly-traded equities.  Both hedge funds were managed by Ursula Management, of which Englander was managing member and with which, after years

of friendship, Englander gave Janecek a job and the title "Partner," a title that was ill-fitted for his responsibilities and compensation.

15.     When Grant texted Englander on June 28, 2018, she had recently come into some additional money that she wanted to invest, and considered Englander a close friend whom she could trust with the investment.  Englander had mentioned the Fund to Grant from time to time over the years, and had encouraged her to invest.

16.     Englander had explained the Fund in lay terms to Grant, telling her that the Fund invested in MLPs and that it was not an investment in natural gas or oil, but rather in "transportation" of gas and oil, for which there would always be demand.  Englander assured her that the Fund was a "safe" investment for long-term investors that paid quarterly dividends.  Still, when she texted Englander on June 28, 2018, Grant had some questions for him.

17.     Following a casual discussion with Englander in which he reassured her about the investment, Grant decided to request the necessary documents to review in order to proceed.

C.     **Grant's Initial Purchase of LP Interests in the Fund in Reliance on the PPM**

18.     On or about the next day, June 29, 2018, Janecek, with Englander's knowledge and consent, gave Grant three formal documents—a Subscription Agreement and Investor Questionnaire ("Subscription Agreement"), a Confidential Private Placement Memorandum, dated May 1, 2012 and amended April 1, 2016 ("PPM"), and a First Amended and Restated Agreement of Limited Partnership ("Partnership Agreement" and, collectively with the Subscription Agreement and PPM, the "Offering Documents")—that Grant she was asked to, and did, agree in the Subscription Agreement to carefully read and rely on in deciding whether to invest in the Fund.

19.     The Fund's limited partnership units were securities, offered to Grant pursuant to a private placement exempt from registration under Section 4(2) of the Securities Act of 1933 (the "'33 Act") and Rule 506, Regulation D, promulgated thereunder.

20.     Each of the Offering Documents was prepared at the direction, and under the supervision, of Ursula Management, and, as the chief everything of the Fund, Englander had ultimate control over the contents and dissemination of each of the Offering Documents, including the PPM.

21.     The PPM was designed to be, and was, the centerpiece of the Offering Documents:  It was the only one of the Offering Documents that described each of (i) the nature of Fund, (ii) the terms of the offering and (ii) the risks associated with investing in the Fund.  As stated in Part 2 of Ursula Management's currently available Form ADV:  "A detailed discussion of the Yield Fund's investment strategies is contained in the Fund's private placement memorandum;" and the "Fund is subject to those risks outlined in its private placement memorandum."  Thus, according to Part 2 of the Form ADV:   "Before purchasing an Interest in the either Fund, each prospective investor should carefully consider various risk factors and conflicts of interest, as well as suitability requirements, restrictions on transfer and withdrawal of Interests and various legal, tax and other considerations, all of which are discussed in the Fund's Private Placement Memorandum."

22.     The PPM provided to Grant disclosed, in both the sections entitled "Summary of the Offering and Partnership Terms" and "Investment Program," that "[t]he primary goal of the Fund is to provide investors with an attractive, risk-adjusted yield, safety, modest capital appreciation and certain tax benefits," and that "[[o]ne particular investment vehicle that will be a focus of the Fund is Master Limited Partnerships ('MLPs')."

23.     The PPM explained that MLPs "provide tax benefits under existing tax treatment" and that "[v]irtually all publicly traded MLPs are invested in energy and infrastructure."  Among "the many different types of public MLPs" in the marketplace, the PPM further disclosed, "the Fund will invest primarily in pipelines, as opposed to exploration vehicles."

24.     The PPM described the "safe[]" and "low risk" approach that the Fund would undertake in selecting MLPs in which to invest, as well as the "variety of methods [the Fund uses] to control risk."  According to the PPM:

•       because the Fund's General Partner (*i.e.,* Ursula Management (*i.e.,* Englander, its managing member)) "believes that the current low interest rate environment will be short lived and has encouraged excess risk taking," "the Fund's management will seek to invest in companies that have built in high margins of safety";

•       the companies in which the Fund will invest will "have not only increased their distributions during the credit crisis, but also have increased their capital investments into their business in order to increase distributions in the future"; "[o]f equal importance, they will be businesses that can continue to sustain and increase their free cash flow – and hence their distributions – under extreme stress in the general economy";

•       "[t]he Fund utilizes a variety of risk analyses created internally and in conjunction with the Prime Broker, and regularly monitors exposure levels in order to ensure portfolio downside risk stays at controlled levels"; and

•       thus, "[t]he Fund's Managers expert[*sic*] to generate low risk but consistent cash yields of 5 to 8% (after fees)."

25.     In accordance with the General Partner's repudiation of "excess risk taking" encouraged by the short-lived "current low interest rate environment," and the Fund's resulting

"safe[]" and "low risk" investment approach, the PPM made crystal clear the Fund's *rejection* of the use of leverage. The PPM stated—in no uncertain terms—in a section entitled "Other Features of the Fund's Investment Strategy" directly under the Fund's "Investment Approach" section:

> ***Leverage.*** The Fund will have no leverage.

26. Consistent with the foregoing, the PPM's "Risk Factor" section *omitted* any risk factor regarding "leverage" (typically found in private placement memoranda or prospectuses of funds using margin in any aspect of their investing or financing activities). Based on publicly available information, including filings with the SEC, a typical risk factor found in the private placement memorandum or prospectus of a fund (*e.g.*, a hedge fund or mutual fund) investing on leverage warns prospective investors, in words or substance, that:

> **Leverage**. The Fund may leverage its capital because the Manager and/or Investment Advisor believe that the use of leverage may enable the Fund to achieve a higher rate of return. Accordingly, the Fund may pledge its securities in order to borrow additional funds for investment purposes. . . .
>
> While leverage presents opportunities for increasing the Fund's total return, it has the effect of potentially increasing losses as well. Accordingly, any event which adversely affects the value of an investment by the Fund would be magnified to the extent the Fund is leveraged. The cumulative effect of the use of leverage by the Fund in a market that moves adversely to the Fund's investments could result in a substantial loss to the Fund which would be greater than if the Fund were not leveraged.

No such words, or similar words, of warning appear anywhere in the PPM.

27. Nor did the PPM disclose any risks specific to MLPs, including any disclosure that the unit prices, and financial condition, of MLPs are sensitive to changes in oil, gas and other commodity prices. For example, the 2017 10-K filed on February 28, 2018 by MPLX LP, an MLP in which Grant now is aware that the Fund was invested, contained a risk factor entitled "A significant decrease or delay in oil and natural gas production in our areas of operation,

whether due to sustained declines in oil, natural gas and NGL [natural gas liquid] prices, natural declines in well production, or otherwise, may adversely affect our revenues, financial condition, and cash available for distribution," and warned, among other things, that "[t]he significant volatility in natural gas, NGL and oil prices could adversely impact our unit price . . ."

28.     Furthermore, according to publicly-available information, including filings with the SEC, MLP funds, including hedge funds or mutual funds substantially invested in natural gas pipeline MLPs, typically include in their private placement memoranda or prospectuses extensive warnings regarding energy-related risk factors, such as:

**Energy Sector Risk**

Many MLP entities operate within the energy sector.  Therefore, the Fund will concentrate its investments in the industry or group of industries that make up the energy sector.   As a result, the Fund will be more susceptible to adverse economic, political, legislative or regulatory occurrences affecting the energy sector.  Risks associated with investments in MLP entities and other companies operating in the energy sector, include the following:

*Commodity Price Risk*.  MLP entities and other companies operating in the energy sector may be affected by fluctuations in the prices of energy commodities, including, for example, natural gas, natural gas liquids, crude oil and coal, in the short- and long-term.  Fluctuations in energy commodity prices may be influenced by changes in general economic conditions or political circumstances (especially of key energy producing and consuming countries), market conditions, weather patterns, domestic production levels, volume of imports, energy conservation, domestic and foreign governmental regulation, international politics, policies of Organization of Petroleum Exporting Countries ("OPEC"), taxation, tariffs, and the availability and costs of local, intrastate and interstate transportation methods, among others.  Companies engaged in crude oil and natural gas exploration, development or production, natural gas gathering and processing, crude oil refining and transportation and coal mining or sales may be directly affected by their respective natural resources commodity prices.  The volatility of commodity prices may also indirectly affect certain companies engaged in the transportation, processing, storage or distribution of such commodities.  Some companies that own the underlying commodities may be unable to effectively mitigate or manage direct margin exposure to commodity price levels.  The energy sector as a whole may also be impacted by the perception that the performance of energy sector companies is directly linked to commodity prices. High commodity prices may

> drive further energy conservation efforts, and a slowing economy may adversely impact energy consumption, which may adversely affect the performance of MLPs and other companies operating in the energy sector.  Recently, oil prices have declined significantly and experienced greater volatility.   This may adversely impact MLP entities and other companies operating in the energy sector. . . .

The PPM contained no such words, or similar words, of warning to prospective investors.

29.     The PPM informed prospective Fund investors of the different types of materials that the investor may be expected to receive regarding her investment:

> The Fund intends to distribute to each Limited Partner the following materials: (i) annual financial statements of the Fund audited by an independent certified public accounting firm; (ii) of such Limited Partner, an unaudited quarterly statement to each Limited Partner with respect to such Limited Partner's Capital Account; (iii) copies of such Limited Partner's Schedule K-1 to the Fund's tax returns; and (iv) other reports as determined by the General Partner in its sole discretion.

30.     While the PPM stated that it should be read in conjunction with the Subscription Agreement and Partnership Agreement, nothing on the face of either document overrode, superseded or was inconsistent with the contents of the PPM.

31.     In reliance on the statements in, and omissions from, the PPM, on or about July 2, 2018, Grant signed the Subscription Agreement, wired the amount of $800,000 to a Fund account, and, upon Ursula Management's and Englander's subsequent acceptance of her subscription, purchased limited partnership units, in that amount, in the Fund.

### D.     Grant's Second Purchase of LP Interests in the Fund

32.     In the months that followed Grant's initial investment in the Fund, she received one or more of the Fund's quarterly newsletters, each composed by Englander as "Managing Partner," briefly describing in a couple of pages the Fund's performance, metrics and outlook during the preceding quarter.  Nothing in any newsletter caused Grant, or reasonably would have

caused any other person, to question the accuracy of the disclosures in the PPM, including that the Fund will have no leverage.  The newsletter(s) gave no indication whatsoever that the Fund was investing on margin, let alone substantial margin.

33.     She also received, after the end of each quarter, an unaudited investor statement or statements showing, both for the quarter ended and for year to date, her beginning capital, contribution/redemptions, dividend income, gain/loss on invested capital, dividend distribution and ending capital.  Similarly, nothing in any investor statement caused Grant, or reasonably would have caused any other person, to question the accuracy of the disclosures in the PPM. The unaudited investment statements also gave no indication whatsoever that the Fund was investing on margin, let alone substantial margin.

34.     In the reliance on the statements in, and omissions from, the PPM, and the absence of any information from Ursula Management and Englander to the contrary, on or about January 2, 2019, Grant authorized a second wire to a Fund account, this one for $500,000, and, upon Ursula Management's and Englander's acceptance of her additional subscription, purchased more limited partnership units, in that amount, in the Fund, bringing her total investment in the Fund to $1,300,000.

E.     **Grant Learns of the Fund's Demise and that Statements and Omissions On Which She Purchased Fund LP Interests Were Fraudulent**

35.     On April 2, 2020, less than two years after her initial investment in the Fund, Grant received by e-mail from Englander the Fund's final newsletter, which was composed by Englander as "Managing Partner."  It notified her that during the prior month, "[i]n March 2020, the Ursula Yield Fund was liquidated."

36.     According to Englander, "[t]he Fund ran into a perfect storm."  As Englander put it:  "[T]he energy industry was faced with the following challenges: weak demand that was clearly going to get worse, a global pandemic, massive additions to supply, and a global price war.  All at the exact same time.  Share prices plunged 60 – 70%."

37.     Then he gave his postmortem in a nutshell:  "In prior letters I wrote that the main risk to our investment was that the American energy industry imploded. That is exactly what happened. It simply happened too fast for me to react to it."

38.     In fact, *no* newsletter (or other document) that Grant was provided *ever* disclosed that the "main risk" to the Fund was a sudden collapse in energy prices.  Just the opposite—the newsletters that Grant received indicated that the Fund was poised to succeed *regardless of energy prices*.  For example, the newsletter that Englander sent following the fourth quarter of 2019, dated January 9, 2020, informed limited partners:

> Our partnership is largely dedicated to natural gas pipelines (slightly above 70%). *Whatever the future of energy is*, *it will include natural gas*. Our management teams, and the executives that run natural gas producers, understand the current environment, and are focused on reducing already-low natural gas emissions down to zero.  If that happens – and substantial capital is being invested with that as a goal – we will look back on today's prices and wish we owned more.
>
> In the meantime, *we can rest easy knowing that our companies have sound balance sheets and generate excess free cash flows that easily cover the distributions they pay to us.*  These cash flows are secured by long term contracts to provide a service that is absolutely mission critical.  (Emphasis added)

39.     In the prior newsletter, dated October 9, 2019, Englander assured investors:

> . . . . *Rest assured that your companies are becoming more valuable every quarter*, and finally taking advantage of the low prices to buy back their own shares.
>
> In addition, *the negative sentiment around energy cannot be sustained*. Renewables simply cannot meet the country's energy needs – best case, wind and solar can cover 15% of what the United States requires. Natural gas is uniquely

positioned to "bridge" the country's energy needs for the next 100 years. It is clean, it is abundant (the United States is the leader in natural gas), it is cheap, and we are even exporting it. *It is simply a matter of time before these facts are translated into higher prices.*

Until that time, we are being paid over 15% to wait for the market to come to its senses. . .

40.     Indeed, the only mention in any newsletter given to Grant that referred to the effect of a sudden decline in energy prices on the Fund's performance appeared in the January 10, 2019 newsletter, which stated no more than that, in the short term, "the price of oil seems to matter."  Englander wrote:

We remain, fundamentally, a natural gas transportation partnership. *Over time, the price of oil has very little to do with our performance. In the current environment – i.e., the short term – the price of oil seems to matter*. While it appears that the price has stabilized, where the price goes is anyone's guess.

41.     That is a far cry from warning Grant and other limited partners of the risk (let alone, the "main risk") that the Fund might collapse in the event of a sudden drop in energy prices.  More to the point, nowhere in the PPM did Ursula Management and Englander warn Grant and other prospective investors that *a* risk, much less, "the main risk," of investing in the Fund would be that a sharp decline in energy prices could result in the Fund's demise and a total loss (or near total loss) of limited partners' investments in the Fund.

42.     Englander advised limited partners in the Fund's final newsletter that, in the wake of the Fund's liquidation, all that remained of the Fund was "one security to distribute, Cypress Environmental Partners (CELP)."  Englander asked investors "to forward the information of a brokerage account to either myself or Anthony Gallo" and "[o]nce we have that we can transfer you the shares."

43.     Englander buried the real leading reason for the Fund's demise until nearly the end of the letter, only then sheepishly revealing:  "What appeared to be a safe level of leverage ultimately proved to be unsafe."  In other words, *it was margin calls* triggered by the sudden drop in the Fund's MLP portfolio that caused the Fund's liquidation.

44.     Only upon a careful review of Englander's final newsletter did Grant learn for the first time that—contrary to the statement in the PPM that "[t]he Fund will have no leverage"—the Fund, in fact, had been investing with the use of leverage.  The risk that the Fund would have to liquidate due to margin calls resulting from a downward swing in energy prices was *never* disclosed to Grant.

45.     Following receipt of the Fund's final newsletter, Grant provided the requisite information concerning her brokerage account to Ursula Management and, on or about April 9, 2020, received 12,751 shares of CELP, having a then market value (according to her brokerage statement) of $5.22 per share.  Grant's purchase of limited partner units in the Fund resulted in a loss of approximately $1 million (net of the $274,000 in total dividends, and $66,500 of CELP shares, she received from the Fund).

**F.      Ursula Management's and Englander's Failure to Provide**
         **<u>Limited Partners with Audited Financial Statements</u>**

46.     Not only did Ursula Management and Englander misrepresent their use of leverage in the Offering Documents, but, in an independent act of manipulation and deception, they actively concealed it.

47.     The Fund procured audits of its annual financial statements by Marcum LLP ("Marcum") for at least the calendar years ended December 31, 2016, December 31, 2017 and December 31, 2018.  Each of those audited financial statements showed that the Fund was

investing significantly with the use of leverage.  Yet, despite representing to the SEC that it was complying with SEC requirements by distributing Fund financial statements to *all* of the Fund's limited partners, which would have revealed the substantial margin risk that the Fund had undertaken, it *never* distributed such audited financial statements to Grant or to other limited partners.

48.     As a registered investment adviser, performing investment advisory services both for the Fund and Ursula Capital, Ursula Management was subject to the SEC "Custody Rule" set forth in 17 CFR section 275.206(4)-2 (*Custody of Funds or Securities of Clients*).  The Custody Rule provides that "it is a fraudulent, deceptive, or manipulative act, practice or course of business within the meaning of section 206(4) of the ['40 Act]" for a registered investment adviser to have custody of client funds or securities, unless the registered investment adviser satisfies a series of enumerated requirements.  Ursula Management had custody of its clients', *i.e.,* the Fund's and Ursula Capital's, funds and securities, and, thus, was required to satisfy the requirements of the Custody Rule in order not to be engaged in a fraudulent, deceptive or manipulative act, practice or course of business.

49.     A registered investment adviser, like Ursula Management, having custody of funds or securities belong to a client that is a limited partnership, like the Fund, is exempt from having to satisfy, or is deemed to have satisfied, several of the Custody Rule's requirements *if* it has its financial statements audited by an independent public accountant at least annually *and* distributes the audited financial statements, prepared in accordance with generally accepted accounting principles, to "*all* limited partners" (emphasis added) within 120 days after the end of the fiscal year.

50.     In fact, that is precisely what Ursula Management *misrepresented* to the SEC it was doing.  In the Uniform Application for Investment Adviser Registration and Reports, or Form ADVs (including the currently available Form ADV, dated March 28, 2019), that Ursula Management filed with the SEC in order to register as an investment adviser, it represented that it was distributing annual audited financial statements to *all* limited partners in order to satisfy the Custody Rule.  In the Form ADVs it filed during the years in question, including the currently available Form ADV, filed on March 28, 2019, Ursula Management checked the box for each of the following questions:

| | |
|---|---|
| Are the private fund's financial statements subject to an annual audit? | Yes |
| Are the private fund's financial statements for the most recently completed fiscal year distributed to the private fund's investors? | Yes |
| Do you have custody of any advisory clients' | |
| (a) cash or bank accounts? | Yes |
| (b) securities? | Yes |
| If you or your related persons have custody of client funds or securities in connection with advisory services you provide to clients, check all the following that apply: | |
| (1) A qualified custodian(s) sends account statements at least quarterly to the investors in the pooled investment vehicle(s) you manage. | √ |
| (2) An independent public accountant audits annually the pooled investment vehicle(s) that you manage and the audited financial statements are distributed to the investors in the pools. | √ |

51.     Ursula Management's representations to the SEC that it was distributing annual audited financial statements to all of the Fund's limited partners were false.  Grant *never* received an audited financial statement of the Fund.  Nor did at least certain of the other limited partners in the Fund.

52.    The failure of Ursula Management (according to Part 2 of its Form ADV, under the "control[]" of Englander) to distribute annual audited financial statements to *all* limited partners—in violation of its representations to the SEC and of the Custody Rule—was an act of deliberate concealment from Grant of the fact that (contrary to the statements in the PPM) Ursula Management and Englander were investing the Fund's assets using leverage.   Ursula Management's failure to distribute to Grant and other limited partners the Fund's annual audited financial statements also was, under the Custody Rule, an independent "fraudulent, deceptive, or manipulative act, practice or course of business" perpetrated against the Fund.

**G.    Ursula Management's and Englander's Intentionally or Recklessly Fraudulent Statements and Omissions Relied on by Grant**

53.    Grant relied on the PPM in making the initial purchase of $800,000 of limited partnership interests in the Fund in July 2018.   In fact, Ursula Management and Englander expressly asked Grant to acknowledge in the Subscription Agreement that she had carefully read and relied on the contents of the PPM.

54.    Additionally, and especially in the absence of any information that reasonably would have led her to question the accuracy of the PPM, she relied on the PPM several months later, in January 2019, when purchasing an additional $500,000 of limited partnership interests in the Fund.

55.    The PPM contained at least the following false statements that Grant relied on:

•      "The Fund will have no leverage."

•      "The Fund's Managers expe[c]t to generate low risk but consistent cash yields of 5 to 8% (after fees)."

- "The Fund utilizes a variety of risk analyses created internally and in conjunction with the Prime Broker, and regularly monitors exposure levels in order to ensure portfolio downside risk stays at controlled levels."

56. At the time that the PPM was provided to Grant, Ursula Management and Englander, as its owner and managing member, knew these statements were false. They knew, when the PPM was given to Grant, that the Fund was using significant leverage to invest in MLPs, which historically are more volatile than stocks or bonds. They knew that the Fund's trading on margin rendered the statement that "[t]he Fund will have no leverage" false. Based on Englander's extensive investment experience, they also could not have reasonably expected that any cash yields generated from investing in MLPs using significant leverage were, or ever would be, "low risk," rendering that statement in the PPM also knowingly false. Additionally, Englander and Ursula Management knew that they were not using any risk arbitrage or other techniques that would "ensure portfolio downside risk stays at controlled levels" in connection with a portfolio consisting exclusively of MLP investments purchased on significant margin.

57. Each of these statements was material, and was included in the PPM precisely because a reasonable investor would view them as significantly altering the total mix of information concerning the investment. Having no prior investment experience with hedge funds, and having had a negative experience with margin trading as a young woman that she has carried with her for decades, each of these statements was material to Grant, and she would not have invested in the Fund without such assurances.

58. The PPM also contained at least the following omissions of fact that rendered the PPM on which Grant relied misleading:

- The PPM failed to disclose any risks associated with investing with leverage, including, but not limited to, that (i) while leverage presents opportunities for increasing the

Fund's total return, it has the effect of potentially increasing losses as well, (ii) any event which adversely affects the value of an investment by the Fund would be magnified to the extent the Fund is leveraged, and (iii) the cumulative effect of the use of leverage by the Fund in a market that moves adversely to the Fund's investments could result in a substantial loss to the Fund which would be greater than if the Fund were not leveraged; and

• The PPM failed to disclose any risks associated with investing in MLPs, including, but not limited to, energy sector risks, such as that (i) significant volatility in natural gas, oil and other energy commodity prices could adversely impact the Fund, (ii) the Fund will be more susceptible to adverse economic, political, legislative or regulatory occurrences affecting the energy sector, and (iii) investments in MLPs in the energy sector may be impacted by the perception that the performance of energy sector companies is directly linked to commodity prices.

59. Each of these risk disclosures misleadingly omitted from the PPM is material, and is typically included in the private placement memoranda or prospectuses of funds offering investment opportunities presenting risks comparable to those associated with investing in the Fund precisely because a reasonable investor would view them as significantly altering the total mix of information concerning the investment. Having no prior investment experience with hedge funds, and having had a negative experience with margin trading as a young woman that she has carried with her for decades, each of these omissions was material to Grant, and she would not have invested in the Fund had she been informed of such risks.

60. The foregoing false and misleading statements and omissions caused Grant's total loss (or near total loss) of her investment. As Englander himself admitted in the Fund's postmortem in the final newsletter, "[w]hat appeared to be a safe level of leverage"—leverage that he and Ursula Management affirmatively misrepresented did *not* exist to Grant in the PPM—"ultimately proved to be unsafe" and resulted in the Fund's demise. Had the Fund not been trading on margin, especially the significant level of margin it was trading on, Ursula

Management and Englander, as the Fund's general partner and chief investment officer, would have been able to weather the disruption in energy markets earlier this year.

61.     Indeed, although the unit prices of the MLPs in the Fund's portfolio dropped precipitously in March when the Fund was forced to liquidate them, they since have partly rebounded.  For illustrative purposes, below is a chart of closing prices for MLPs that, according to the Fund's newsletters, were in the portfolio when the Fund was forced to liquidate.  As it shows, most of the MLPs increased significantly in price following their March 2020 depths.

| Ticker Symbol[1] | 1/2/20 | 3/2/20 | 3/30/20 | 4/30/20 | 6/10/20 | 7/1/20 |
|---|---|---|---|---|---|---|
| AM | 7.09 | 4.44 | 2.18 | 4.75 | 5.59 | 5.19 |
| CEQP | 31.22 | 20.88 | 3.55 | 10.94 | 17.35 | 12.71 |
| EQM | 29.65 | 15.97 | 10.50 | 20.14 | 21.61 | 21.37 |
| ET | 13.34 | 11.83 | 4.53 | 8.40 | 8.77 | 7.09 |
| MPLX | 25.90 | 20.07 | 10.06 | 18.10 | 19.25 | 17.33 |
| NGL | 11.51 | 7.95 | 2.39 | 6.05 | 6.53 | 4.03 |
| WES | 20.32 | 13.71 | 3.11 | 8.68 | 12.09 | 9.92 |

62.     In its brochure, filed with the SEC as Part 2 of its Form ADV, Ursula Management states:  "The Yield Fund is . . . focused on long-term results, not quarterly returns. Limited Partners should be long-term investors in the Fund and should be willing to commit capital for an appreciable length of time."  In the PPM, Englander promoted to prospective investors the Fund's "long-term investment style" premised on the Fund managers' belief in

---

[1] Source:   https://www.marketwatch.com/tools/quotes/historical.asp.   AM = Antero Midstream Corp.; CEQP = Crestwood Midstream Partners LP; EQM = EQM Midstream Partners LP; ET = Energy Transfer LP; MPLX = MPLX LP; NGL = NGL Energy Partners LP; WES = Western Midstream Partners, LP.

being "prepared to hold the securities they purchase and collect distributions, even during volatile market conditions."   Englander reinforced that message time and again in his newsletters, telling investors that, while "the price of oil . . . seems to drive the price of everything in the energy world," "[o]ver time, the price of oil has very little to do with our performance," that "the negative sentiment around energy cannot be sustained," and that, therefore, "[i] is simply a matter of time before these facts are translated into higher prices." Indeed, just a little more than two months before the Fund's demise, Englander assured investors that, in the future, "we will look back on today's prices and wish we owned more" and that "[i]n the meantime, we can rest easy knowing that our companies have sound balance sheets and generate excess free cash flows that easily cover the distributions they pay to us."

63.     Yet by trading on margin, especially so extensively, in direct violation of the representations in the PPM, Ursula Management and Englander betrayed the fundamental investments principles that they assured investors and prospective investors they were following and would continue to follow, and deprived the very "long-term investors" for which the Fund was designed of a fair opportunity to realize on their investments.  As a result, instead of being able to ride out the temporary disruption in energy prices and wait for MLP prices to rebound, which, over the long term, Englander assured his investors would happen, Ursula Management and Englander were compelled to liquidate the Fund's MLP portfolio at the depth, or near depth, of the market and at a total, or near total, loss to the Fund's limited partners.

64.     The fact that the *entire* portfolio was comprised of pipeline MLPs and, thus, subject to acute risks arising from volatility in price, supply and/or demand in the energy sector—risks *never* disclosed to prospective investors, including Grant, in the PPM—also directly contributed to the Fund's liquidation and, hence, Grant's total, or near total, loss.  It was

the precipitous decline in the price of MLPs in the portfolio—a decline instigated, in Englander's own words in the final newsletter, by simultaneous daunting "challenges" facing the "energy industry"—that triggered the margin calls forcing the liquidation of the Fund's portfolio.

65.     In short, had Ursula Management and Englander accurately described the Fund's activities and risks to Grant, she would not have purchased any limited partnership interests in the Fund, and the activities and risks that Ursula Management and Englander misrepresented, or misleadingly failed to disclose, to Grant were the root causes of the Fund's demise and Grant's complete, or near complete, loss of her total $1.3 million investment in less than two years.

## COUNT I

### Violation of Section 10(b) of the '34 Act and
### Rule 10b-5 Promulgated Thereunder Against Both Defendants

66.     Plaintiff repeats each of the allegations set forth in paragraphs 1 through 65 hereof, as if fully set forth herein.

67.     Defendants disseminated and/or approved the materially false and misleading statements specified above, which, at the time, they knew or deliberately disregarded were false and misleading, in that they contained misrepresentations and failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

68.     Defendants violated Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)], and Rule 10b-5 [17 C.F.R. §240.10b-5], in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course

of business which operated as a fraud and deceit upon Plaintiff as a purchaser of the Fund's limited partnership units.

69.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff has been injured in connection with her purchases of limited partnership units in the Fund.

70.     Plaintiff is entitled to the remedy of rescission for her purchases, in reliance on the PPM, of the Fund's limited partnership units, which she would not have purchased if she had been aware of the misleading statements therein and/or omissions therefrom.

71.     In the alternative, Plaintiff has suffered damages from her purchases, in reliance on the PPM, of the Fund's limited partnership units, which she would not have purchased if she had been aware of the misleading statements therein and/or omissions therefrom.

## COUNT II
### Violation of Section 20(a) of the '34 Act Against Englander

72.     Plaintiff repeats each of the allegations set forth in paragraphs 1 through 71 hereof, as though fully set forth herein.

73.     Englander acted as a controlling person of Ursula Management within the meaning of Section 20(a) of the Exchange Act, as alleged herein.  By virtue of his position as the managing member, and his total or near total ownership, of Ursula Management, Englander had the power and authority to cause Ursula Management to engage in the wrongful conduct complained of herein.

74.     As set forth above, Ursula Management violated Section 10(b) and Rule 10b-5 by its acts and/or omissions as alleged in this Complaint.  Moreover, by virtue of his position as a

controlling person, Englander is liable pursuant to Section 20(a) of the Exchange Act for Ursula Management's §10(b) and Rule 10b-5 violations.

75.     As a direct and proximate result of Englander's wrongful conduct, Plaintiff has been injured in connection with her purchases of the Fund's limited partnership units.  By reason of such conduct, Englander is liable pursuant to Section 20(a) of the Exchange Act.

**COUNT III**

**<u>Common Law Fraud Against Both Defendants</u>**

76.     Plaintiff repeats each of the allegations set forth in paragraphs 1 through 75 hereof, as if fully set forth herein.

77.     Defendants knowingly or recklessly made the material misstatements in, and omitted the material facts from, the PPM as described above in order to induce Plaintiff to purchase limited partnership units in the Fund.

78.      In reasonable reliance on the material misstatements in, and material omissions from, the PPM, Plaintiff purchased Fund limited partnership units, which she would not have purchased if she had been aware of the misleading statements therein and/or omissions therefrom.

79.     Following each of Plaintiff's purchases of Fund limited partnership units, Defendants communicated with Plaintiff concerning the activities, performance and outlook of the Fund, but purposefully concealed from Plaintiff, with the intent of inducing her not to redeem her limited partnership units in the Fund, the material facts, described above, that the Fund was investing with the use of leverage, that investing with the use of leverage carries substantial risks, that the Fund's investment approach and risk control measures were not as conservative as

described in the PPM, and that investing in MLPs subjected the investment to significant risks relating to the energy sector.

80.     Plaintiff reasonably relied on Defendants' material omissions in not redeeming her limited partnership units in the Fund.

81.     As a direct and proximate result of Defendants' material misstatements and omissions, Plaintiff has been injured.

82.     Plaintiff is entitled to the remedy of rescission for her purchases, in reliance on the PPM, of the Fund's limited partnership units, which she would not have purchased if she had been aware of the misleading statements therein and/or omissions therefrom.

83.     In the alternative, Plaintiff has suffered damages from her purchases and/or non-redemption of the Fund's limited partnership units, which she would not have purchased and continued to hold if she had been aware of Defendants' misleading statements and/or omissions.

## COUNT IV
### Breach of Fiduciary Duty Against Both Defendants

84.     Plaintiff repeats each of the allegations set forth in paragraphs 1 through 83 hereof, as if fully set forth herein.

85.      At all relevant times, each of Defendants owed a fiduciary duty to the Fund's limited partners, including Plaintiff.  That fiduciary duty required Defendants, among other things, to be honest and truthful in all of their dealings with the Fund's limited partners, to act, at all times, in the best interests of the Fund's limited partners, to exercise the care that an ordinarily prudent person in a like position would exercise under similar circumstances, to avoid

self-dealing and other conflicts of interest, to avoid corporate waste and, at all times, to act in good faith.

86.     Defendants breached their fiduciary duties to Plaintiff by, among other things, (i) making statements to Plaintiff regarding her investment in the Fund that Defendants knew or should have known were materially false or materially misleading, (ii) omitting or concealing from Plaintiff material information concerning the Fund's activities and risks, and (iii) managing the Fund's investments in knowing or reckless disregard of the investment principles that Defendants represented they would follow.

87.     As a direct and proximate result of Defendants' breaches of fiduciary duty, Plaintiff has been injured, and has suffered damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in her favor against Defendants, jointly and severally, as follows:

A.      On Counts I and II, awarding Plaintiff rescission of Plaintiff's purchases of limited partnership units in the Fund or, in the alternative, damages in an amount to be determined at trial, together with interest thereon;

B.      On Count III, awarding Plaintiff rescission of Plaintiff's purchases of limited partnership units in the Fund or, in the alternative, damages in an amount to be determined at trial, together with interest thereon;

C.      On Count IV, awarding Plaintiff damages in an amount to be determined at trial, together with interest thereon;

D.      Awarding Plaintiff her reasonable costs and expenses incurred in this action, including, but not limited to, attorneys' and expert fees and expenses; and

E.      Granting Plaintiff such other and further relief as the Court deems just, equitable and proper.

Date:   July 2, 2020
        New York, New York

                                OTTERBOURG, P.C.


                                By:  _____*/s Adam C. Silverstein*_____
                                        Adam C. Silverstein

                                230 Park Avenue
                                New York, New York 10169
                                (212) 661-9100
                                *Attorneys for Plaintiff Wendy Norris Grant*